ASOCIACIÓN MÉDICA DE PUERTO RICO, INC., Plaintiff and Appellant, *v.* Pío RECHANI, Defendant and Appellee.

No. 4776.   Argued December 11, 1930.—Decided March 31, 1931.

*Feliú & La Costa* for appellant.   *R. Martínez Nadal* and *Celestino Iriarte* for appellee.

MR. JUSTICE TEXIDOR delivered the opinion of the Court.

The Medical Association of Puerto Rico, alleging that it is a corporation organized according to law, filed a petition for an injunction in the District Court of San Juan to restrain Pío Rechani from practicing medicine.   Apart from the averment already stated, it is alleged in the complaint that the defendant, without having a license from the Insular Board of Medical Examiners and without any authority under the laws of Puerto Rico, has been practicing medicine, making diagnoses, prescribing for persons, filling the office of municipal physician in violation of Act No. 73 of 1923 and Act No. 15 of 1924, and without having a diploma from any medical school recognized by the Board of Medical Examiners or any license from such Board; that the taking or ingestion

of the medicines and drugs prescribed for patients by the defendant constitutes a public danger; that the defendant charges fees to patients for his treatments; that such acts are prejudicial to the members of the plaintiff association who are thus deprived of the compensation which they would otherwise receive from prospective patients, a loss which can not be accurately estimated; and that the defendant is insolvent and the injured parties could not enforce any judgment granting damages against him.

The defendant answered and denied that he was practicing medicine unlawfully. He also set up that by virtue of the provisions of Act No. 79 of 1911 he has been practicing medicine, holding office, and prescribing for patients, without usurping the functions of licensed physicians in Puerto Rico, and without receiving any other than just compensation from his patients for his services; he denied that his acts are dangerous to the health or safety of the people, or that the same have caused any damage to the plaintiff or its members.

At the hearing the defendant presented a motion to quash which, as appears from the opinion of the court, the parties agreed to consider as a demurrer. The defendant moved thereby to dismiss the complaint: (a) Because the facts stated therein are insufficient to warrant the issuance of a writ of injunction; (b) because the plaintiff had no legal capacity to apply for the writ; and (c) because the plaintiff had an adequate remedy at law.

The court denied the petition for injunction, and gave the reasons for its decision in an opinion in which it specially analyzes its jurisdiction as a court of equity, the propriety of the issuance of the writ, the capacity of the plaintiff to sue, the existence of a remedy at law and of the special damages to the plaintiff. Thereupon the latter appealed, and it has assigned five errors.

The appellant urges that the court erred in holding that it had no jurisdiction of this proceeding because of the nature thereof.

In the opinion forming the basis of its judgment, the district court states that the law relied upon by the plaintiff is Act No. 73 of 1923, as amended by Act No. 15 of July 1, 1924, which prescribes that the unlawful practice of medicine and surgery is a misdemeanor and provides that the Board of Medical Examiners may investigate the identity of any person who passes himself off as a physician and, in a proper case, may cancel his license and advise the Attorney General to prosecute the offender before the courts. The court expressed the view that the law in this respect is a penal statute, and further said:

" . . . A court of equity has no jurisdiction to enjoin the commission of crimes or interfere to prevent unlawful acts solely because they are unlawful, and the reason for this is not only the lack of jurisdiction, but also the existence of an adequate remedy at law; in other words, courts of equity should not intervene in the administration of a criminal statute."

In support of this doctrine citation is made of Spelling, of Wharton on Criminal Law, and of Corpus Juris.

As opposed to these views of the trial court, the appellant cites the holding in the case of *In re Debbs,* 158 U.S. 564, 593, where it was said:

"Again, it is objected that it is outside of the jurisdiction of a court of equity to enjoin the commission of crimes. This, as a general proposition, is unquestioned. A chancellor has no criminal jurisdiction. Something more than the threatened commission of an offense against the laws of the land is necessary to call into exercise the injunctive powers of the court. There must be some interferences, actual or threatened, with property or rights of a pecuniary nature, but when such interferences appear the jurisdiction of a court of equity arises, and is not destroyed by the fact that they are accompanied by or are themselves violations of the criminal law."

The essential facts in that case differ greatly from those in the case now before us. In the *Debbs* case it appears that there were twenty-two railroad companies engaged in interstate traffic and transportation, carrying into the States

various goods in large quantities and also the mail, and had carried troops, munitions, and victuals; that the defendants were officers of the American Railway Union; that a dispute arose between the Pullman Palace Car Company and its employees, who left the service of the company; that the said Union established a boycott against the company. It was alleged that the defendants and their agents were stopping the railway traffic, calling off the employees of said company, disabling railroad material, and using violence, etc. The petition for injunction was filed and argued by the district attorney for the Northern District of Illinois under the direction of the Attorney General. The writ of injunction was issued and served on several of the interested parties. As some of them disobeyed the writ, contempt charges were brought against them, and pursuant to such charges they were sentenced to imprisonment in jail for terms varying from three to six months. The defendants then applied for a writ of error and also one of habeas corpus. The above-cited opinion was rendered in the latter proceeding. Of course, as the facts in that case are not the same as those in the present one, it is difficult to apply with any rigor to the latter what was decided in the former, except some general principles.

In the case cited the damage was general, brought about by the acts of the defendants who were obstructing and hindering the interstate commerce, preventing the transportation of necessary articles, which acts were of a violent nature. The facts in the case at bar have no substantial analogy with those in the *Debbs* case. There the Supreme Court said (p. 577):

"The case presented by the bill is this: The United States, finding that the interstate transportation of persons and property, as well as the carriage of the mails, is forcibly obstructed, and that a combination and conspiracy exists to subject the control of such transportation to the will of the conspirators, applied to one of their courts, sitting as a court of equity, for an injunction to restrain such

obstruction and prevent carrying into effect such conspiracy. Two questions of importance are presented: First. Are the relations of the general government to interstate commerce and the transportation of the mails such as authorize a direct inference to prevent a forcible obstruction thereof? Second. If authority exists, as authority in governmental affairs implies both power and duty, has a court of equity jurisdiction to issue an injunction in aid of the performance of such duty."

Further on, at page 583 of the cited volume, the following is stated:

"So, in the case before us, the right to use force does not exclude the right of appeal to the courts for a judicial determination and for the exercise of all their powers of prevention. Indeed, it is more to the praise than to the blame of the government, that, instead of determining for itself questions of right and wrong on the part of these petitioners and their associates and enforcing that determination by the club of the policeman and the bayonet of the soldier, it submitted all those questions to the peaceful determination of judicial tribunals, and invoked their consideration and judgment as to the measure of its rights and powers and the correlative obligations of those against whom it made complaint. And it is equally to the credit of the latter that the judgment of those tribunals was by the great body of them respected, and the troubles which threatened so much disaster terminated."

In the same opinion citation is made of the case of *United States* v. *Bell Telephone Company*, 128 U.S. 315 in which it was claimed by one of the parties that the United States had no pecuniary interest in the subject matter of the suit; but this contention was overruled, it being held, in accordance with the doctrine laid down in *United States* v. *San Jacinto Tin Co.*, 125 U. S. 273, that it was evidently in the mind of the court that the case before it was one where the property right to the land in controversy was the matter of importance, but it was careful to say that the cases in which the instrumentality of the court could not thus be used were those where the United States had no pecuniary interest in the remedy sought.

As we have been cited to some paragraph from that

opinion, it seems advisable to consider the same carefully in order not to give it a greater scope than it really has. There the Supreme Court said:

"Again, it is objected that it is outside of the jurisdiction of a court of equity to enjoin the commission of crimes. This, as a general proposition, is unquestioned. A chancellor has no criminal jurisdiction. Something more than the threatened commission of an offence against the laws of the land is necessary to call into exercise the injunctive powers of the court. There must be some interferences, actual or threatened, with property or rights of a pecuniary nature, but when such interferences appear the jurisdiction of a court of equity arises, and is not destroyed by the fact that they are accompanied by or are themselves violations of the criminal law. Thus, in Cranford v. Tyrrell, 128 N. Y. 341, an injunction to restrain the defendant from keeping a house of ill-fame was sustained, the court saying, on page 344: 'That the perpetrator of the nuisance is amenable to the provisions and penalties of the criminal law is not an answer to an action against him by a private person to recover for injury sustained, and for an injunction against the continued use of his premises in such a manner.' And in Mobile v. Louisville & Nashville Railroad, 84 Alabama, 115, 126, is a similar declaration in these words: 'The mere fact that an act is criminal does not divest the jurisdiction of equity to prevent it by injunction, if it be also a violation of property rights, and the party aggrieved has no other adequate remedy for the prevention of the irreparable injury which will result from the failure or inability of a court of law to redress such rights'."

As may be seen, the proposition that the power of repressing or preventing crimes is not within the jurisdiction of courts of equity, is regarded as undisputed. A chancellor has no criminal jurisdiction. In order that he may act, "something more than the threatened commission of an offense against the laws of the land is necessary." This "something more" is an attack to some property or pecuniary interest, and then equity intervenes even though the acts in question be of a criminal nature. The citation made of the decision in *Mobile* v. *Louisville & Nashville Railroad* is very important. That decision shows that it is necessary that the

party aggrieved should have no other adequate remedy for the prevention of the irreparable injury.

The Puerto Rican legislation on the subject is embodied in the Acts No. 79 of 1911, No. 73 of 1923, and No. 15 of 1924. The original act of 1903 is not considered, because for the purpose of the present case this is unnecessary.

Act No. 79 of 1911 amends a section of the Act of 1903 and prescribes the manner in which persons desiring to practice medicine may obtain a license therefor. A proviso in the amended section says that those persons who have been practicing medicine in Puerto Rico for a period of five years prior to the approval of the act shall be entitled to continue in the practice of their profession without being subject to the provisions of the statute.

Act No. 73 of 1923 established a Board of Medical Examiners and fixed its powers and duties. According to its provisions, for the authorized practice of medicine in Puerto Rico there is required, besides a diploma, full age and good conduct, a license issued by the Board after an examination for admission, and some exemptions from such examination are provided.

Act No. 15 of 1924 (Session Laws, p. 122) amended several sections of the act above cited, including section 25 which, as finally enacted, reads as follows:

"Sec. 25. The Board of Medical Examiners, on its own initiative or by virtue of complaint or charges duly justified by any citizen, may at any time investigate the identity of any person representing himself to be or advertising himself or passing as a physician surgeon, osteopath, *practicante*, optometrist, midwife, male or female nurse, whether licensed or not by the Board, and after serving written notice on the party interested, the board shall have power to require such person to file reasonable evidence, to the satisfaction of the board, that he possesses a license legally obtained to practise his profession in the Island of Porto Rico, and that such person is really the person to whom the aforesaid license was originally issued. Should the investigation show that the person complained against does not possess a license to practice or that the

license possessed by him does not legitimately belong to him, the board shall cancel said license, and shall, furthermore, in either case, transmit the record to the Attorney General of Porto Rico for due prosecution of the violator in the courts of the Island; *Provided,* That the Board of Medical Examiners shall have power to withdraw and cancel temporarily or definitively the license possessed by any physician-surgeon, osteopath, *practicante,* optometrist, midwife, male or female nurse, upon conviction in any of the following cases: Fraud or deceit committed in the practise of his profession; felony; habitual drunkenness or addiction to the use of narcotic drugs; for provoking or aiding to provoke in any manner, method or form, a criminal abortion by a woman; repeated excesses in the professional powers established by this Act; mal-practise, that is, gross and manifest incompetence to the prejudice of a third party in the practise of his profession; immoral and dishonorable conduct; *Provided, further,* That the procedure to be followed in the temporary cancellation or suspension of a license shall be instituted by one of the members of the board designated by the chairman, on complaint filed by any of the members of the board or affidavit filed by any citizen. The complaint or affidavit shall in every case state facts constituting *prima facie* probable cause. The defendant shall have for the purpose of his defense before the Board of Medical Examiners all the rights granted to persons accused of crime, except trial or investigation by jury; *Provided, further,* That in a case of cancellation or suspension of license the decision of the Board of Medical Examiners shall be transmitted to the prosecuting and police authorities of the Island for enforcement thereof; but that in cases referred to in the immediately preceding proviso tried by the board, its decision being the suspension or cancellation of a license for more than one year, such decision shall not be final nor shall it be communicated to prosecuting and police authorities until a district court shall have revised and tried the case, to which court the professional sentenced by the Board of Medical Examiners shall have the right of appeal on review, which right he shall exercise within a term of ten days.''

These statutory provisions fix the procedure in an unequivocal manner. The Board of Medical Examiners has the necessary power to require proof of the possession of a license for practicing the profession, and the result of the investigation leads to the transmission of the record to the Attorney General for the prosecution of the transgressor

before the courts of the Island. It clearly appears from one of the provisos that such action by the Attorney General is not to be confined to the criminal side, since mention is made of the cancellation or suspension of the license.

We may, therefore, lay aside the question of whether or not a court of equity has jurisdiction to grant injunctive relief in a case like the present one, as the statute itself furnishes a solution of the problem regarding the capacity of the plaintiff herein to institute and prosecute a proceeding to enjoin the defendant from practicing medicine. In our opinion, the Board of Medical Examiners is the one empowered by law to take the initiative and to transmit the record to the Attorney General for action by him before the courts. This being so, the judgment sought to be reversed is correct.

We do not think that in rendering the decision appealed from any of the errors assigned by the appellant has been committed.

The plaintiff has no legal capacity to sue in the premises. Moreover, there exists a plain, adequate, and complete remedy at law; and the complaint fails to show the irreparable injury to the plaintiff.

The judgment appealed from must be affirmed.